UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　　)
　PLAINTIFF,　　　　　　　　　　　)CASE NO. 2:17-cr-138 (1)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　vs.　　　　　　)
　　　　　　　　　　　　　　　　　　)
BERND D. APPLEBY,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　DEFENDANT.　　　　　　　　　　　)
_____　　　)


TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE JAMES L. GRAHAM, SENIOR JUDGE
THURSDAY, APRIL 5, 2018; 9:35 A.M.
COLUMBUS, OHIO

　FOR THE PLAINTIFF:
　　　Benjamin C. Glassman
　　　United States Attorney
　　　By:　JESSICA H. KIM
　　　Assistant United States Attorney
　　　303 Marconi Boulevard, Suite 200
　　　Columbus, Ohio 43215

　FOR THE DEFENDANT:
　　　McNeese Wallace & Nurick LLC
　　　By:　KARL H. SCHNEIDER, Esq.
　　　21 East State Street, Suite 1700
　　　Columbus, Ohio 43215
　　　　　　　　　　　　　- - -


　　　Proceedings recorded by mechanical stenography,
transcript produced by computer.


ALLISON KIMMEL, RDR, CRR, CRC
FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD, ROOM 121
COLUMBUS, OHIO 43215
614-719-3225

                                                                          2
 1                                          Thursday Morning Session

 2                                          April 5, 2018

 3                              - - -

 4        (The following proceedings were had in open court.)

 5             THE COURT:  Good morning, ladies and gentlemen.  The

 6   Court will recognize Assistant United States Attorney Jessica

 7   Kim.  Good morning, Ms. Kim.

 8             MS. KIM:  Good morning, Your Honor.

 9             THE COURT:  Does the Government have a case to present

10   to the Court this morning?

11             MS. KIM:  Yes, Your Honor.

12             THE COURT:  Very well.  The clerk may call the case.

13             COURTROOM DEPUTY:  2:17-CR-138-1, the United States of

14   America versus Bernd D. Appleby.  The defendant will come

15   forward.

16             THE COURT:  Are you Bernd Appleby?

17             THE DEFENDANT:  Yes, I am.

18             THE COURT:  And you are represented by Attorney Karl

19   Herbert Schneider; is that correct?

20             THE DEFENDANT:  Yes, indeed.

21             THE COURT:  Good morning, Mr. Schneider.

22             MR. SCHNEIDER:  Good morning, Your Honor.

23             THE COURT:  Ms. Kim, what is the status of this case?

24             MS. KIM:  Your Honor, on August 16th, 2017, the

25   defendant, Bernd Appleby, entered a plea of guilty to a

1    one-count Bill of Information charging him with conspiracy to

2    commit wire fraud, in violation of 18 United States Code

3    Section 1349.

4         The defendant is before the Court today for sentencing.

5         THE COURT:  Very well.  This case presents the Court

6    with a Rule 11(c)(1)(C) plea agreement which contains not just

7    a guilty plea but also certain stipulations regarding the

8    maximum applicable penalties in this case, and so the first --

9    the first order of procedure this morning is to determine

10   whether or not the Court will accept such a plea agreement in

11   this case.

12        Now, under Rule 11(c)(1)(C) of the Federal Rules of

13   Criminal Procedure, the Court has broad discretion whether to

14   accept or reject a Rule 11(c)(1)(C) plea agreement.

15        The Court must consider the facts and circumstances of

16   the case and determine whether the stipulated sentence would

17   serve the ends of justice and whether it is too lenient or

18   would otherwise not be adequate to serve the public interest.

19        The Court must evaluate the sentence to ensure that it

20   is sufficient, but not greater than necessary, to comply with

21   the statutory sentencing factors set forth in Section 3553(a).

22        If the agreed sentence is not within the applicable

23   guideline range, the Court must determine if any departure from

24   that range is supported by justifiable reasons.

25        Now, the Court has reviewed the submissions of the

4

1    parties regarding the Rule 11(c) plea agreement, and the first

2    issue the Court needs to address is the applicable guideline

3    sentencing range in order to decide whether the case falls --

4    whether the agreed sentence falls within the guidelines, and in

5    this case there is an exception to the calculations made by the

6    probation officer regarding the guidelines.

7         In particular, there is -- there is an objection to the

8    probation officer's conclusion that there should be a sentence

9    enhancement in this case in the determination of the guidelines

10   based on the existence of a conspiracy which was -- consisted

11   of five or more individuals or was otherwise extensive.

12        So I would like to hear from counsel on that issue

13   initially, and I would like to hear from the objecting party.

14   That would be Mr. Schneider on behalf of defendant.

15        Mr. Schneider.

16        MR. SCHNEIDER:  Your Honor, thank you very much.

17        We did -- and I also want to say there were some

18   objections that we had also made to certain factual statements

19   made in the final --

20        THE COURT:  Yes, I'm aware of that.

21        MR. SCHNEIDER:  -- PSR.  We're withdrawing those.

22   We're not going to make an issue and will stand on those.

23        THE COURT:  Very well.  The Court appreciates that.

24        MR. SCHNEIDER:  So the remaining -- the remaining

25   objection, which is the substantive enhancement objection, does

1    deal with the aggravating role enhancement that the probation

2    department has recommended, and my understanding is that the

3    Government supports.

4         My understanding is that it is premised on the -- on the

5    prong that there's five or more participants.

6         It is our belief, and I think Ms. Kim may --

7         THE COURT:  Well, we've got four for sure.

8         MR. SCHNEIDER:  We have four.  We have four.

9         THE COURT:  All right.  Tell me about the fifth.  This

10   issue there, is this Mr. Chowdry?

11        MR. SCHNEIDER:  No.  It's Atul Dhall -- D-a -- D-a --

12   D-l -- D-h-a-l-l -- is the participant --

13        THE COURT:  Yes.

14        MR. SCHNEIDER:  -- that would be added into the mix as

15   the fifth participant according to the Government's theory and

16   the probation officer's report.

17        Our reading -- our understanding of the facts, for one,

18   and our reading of the *Anthony* case and also the *Lewis* case,

19   which are both Sixth Circuit cases that dealt with this issue,

20   are that a generalized suspicion on the part of an individual

21   isn't enough to make the case of participancy.  You really have

22   to be a co-conspirator in the truest sense.  You would have to

23   be guilty and culpable of a crime.

24        THE COURT:  And you would have to have knowledge.

25        MR. SCHNEIDER:  And you would have to have knowledge,

6

1   which is one of the elements of the crime.  So our view, as it

2   stands right now, is that Mr. Dhall came to the company very

3   late in the game.  He came to the company in 2010.  He was

4   housed on the West Coast, although he had a direct report in

5   Jason Joyce, which is one of the defendants with whom you have

6   dealt with back in December.

7        He didn't have much contact with Joyce on a day-to-day

8   basis.  He was not part of the Oracle litigation, Mr. Dhall,

9   that is.  He was not a named party in the Oracle litigation.

10  He wasn't a participant in the resolution of that litigation,

11  and we take the view that -- that Mr. Dhall was a conduit for

12  information.

13       He was privy to certain emails.  He might have had some

14  generalized suspicion, but not enough to make him a participant

15  for purposes of the enhancement, and I think that the fact that

16  the Government chose not to prosecute him -- and I understand

17  the Government doesn't have to prosecute every co-conspirator

18  -- my view is that the Government didn't view Mr. Dhall in

19  terms of a co-conspirator.

20       They may tell you otherwise, but in the end of the day,

21  there was no case brought against him, and my suspicion on that

22  is probably because he was in their mind a conduit.

23       He wasn't certainly enough of a participant that they

24  felt like there was a prosecutable offense, and so that's -- if

25  you are asking me generally, I think Ms. Kim may put on some --

7

1    some evidence in that regard, but I think based on the holdings

2    of -- the Sixth Circuit holdings in *Anthony*, which dealt with a

3    conspiracy to remove safety devices, of all things, from

4    cigarette lighters, and then the *Lewis* case, where a woman was

5    getting gift certificates at a casino and then asking people to

6    go up and cash them for her, in both of those cases, Your

7    Honor, the Court said that's -- that you are a participant --

8    you are not enough of a participant to be liable for a criminal

9    offense, and we're going to hold participancy by the standard

10   by which you would be prosecuted and you would have to have

11   knowledge.

12        In the *Anthony* case, the lawyer sent a letter to the

13   Government, and the case that the Government brought dealing

14   with the safety devices conspiracy were false statements, and

15   they said the lawyer was simply passing along on his letterhead

16   communications that he had had with the others and that that

17   just doesn't rise to that particular threshold.

18        So you asked me the basis of our objection.  I think at

19   this point in time, that is the basis of our objection.  That

20   Atul Dhall much more closely resembles the lawyer in *Anthony*

21   and much more closely resembles one or more patrons of a

22   Mississippi casino that was cashing checks.

23        He was not really in the management loop, didn't have

24   any -- I think that bears out.  He had not a whole lot of

25   contact with Jason Joyce, and he was located in California, and

8

1  his direct report, Jason Joyce, was in the Dublin office, where

2  Mr. Olding and Mr. Quinn were, albeit Mr. Appleby was in the

3  West Coast office.

4        THE COURT:  All right.  Mr. Schneider, it's my

5  impression that the -- that the key to the issue is whether or

6  not Mr. Dhall had actual knowledge of the fraud.

7        There's no dispute that he performed some functions and

8  assisted in carrying out the fraudulent scheme, is there?

9        MR. SCHNEIDER:  That's correct.

10        THE COURT:  So the question is did he know it?  Did he

11  know it was fraudulent?

12        MR. SCHNEIDER:  Right.

13        THE COURT:  All right.  All right.  Ms. Kim.

14        MS. KIM:  Your Honor, I believe there are three major

15  issues with respect to the enhancement:  First, was the

16  defendant an organizer and leader?  I thought he was contesting

17  the fact that we had asserted he received a larger share of the

18  financial fruits of the crime.

19        THE COURT:  No.  I think this boils down to one issue:

20  Did Mr. Dhall know of the fraud?

21        MS. KIM:  And our contention is yes, and we're

22  prepared to produce evidence on that.

23        THE COURT:  All right.  Fine.  Counsel, you may be

24  seated at counsel table, and the Government may call its first

25  witness.

1        MS. KIM:  Thank you, Your Honor.  The United States

2  calls Special Agent David Fine.

3        THE COURT:  Sir, please step forward and the clerk

4  will swear you in.

5     (Witness sworn.)

6                          - - -

7                        DAVID FINE

8   Called as a witness on behalf of the Plaintiff, being first

9  duly sworn, testified as follows:

10                    DIRECT EXAMINATION

11  BY MS. KIM:

12  Q    Good morning.

13  A    Good morning.

14  Q    Can you please state your name for the record and spell

15  your last name for the court reporter?

16  A    My name is David Graham Fine.  My last name is spelled

17  F-i-n-e.

18  Q    Mr. Fine, where do you work?

19  A    I'm an FBI supervisory special agent.

20  Q    How long have you been in that position?

21  A    I've been a supervisory special agent since July of last

22  year.

23  Q    What about a non-supervisory special agent?

24  A    Since 2011.

25  Q    Where did you serve in that role?

10

1    A    I served in that role here in Columbus, Ohio.

2    Q    And how long did you serve in that role?

3    A    From September 2011 through July 2017.

4    Q    What kind of training have you had for that position?

5    A    As an FBI agent, for starters, we have approximately 21

6    weeks of training at FBI Academy when we become an FBI

7    employee.

8         That training is extensive.  It covers all areas of law

9    enforcement, from investigating cases generally to financial

10   cases specifically, and cyber investigations as well.

11        After FBI Academy, I have had several secondary

12   trainings, specifically, detailed trainings on white collar

13   crimes, on cyber crimes; and I have received extensive outside

14   vendor training in cyber matters.

15   Q    What did you do before you were -- became a special

16   agent for the FBI?

17   A    Before becoming an FBI agent, I was an attorney for

18   approximately seven and a half years, specializing in complex

19   financial transactions.

20   Q    Have you been involved in the investigation of the

21   defendant, Bernd Appleby?

22   A    I have.

23   Q    Explain to us how that investigation came about.

24   A    In July 2014 I received a complaint forwarded to the FBI

25   through the United States Attorney's Office, and that complaint

11

1   came from counsel to Oracle, the victim in this case.

2   Q     What did the complaint entail?

3   A     The complaint alleged a widespread fraud of their

4   intellectual property that they had uncovered as part of a

5   civil litigation that they had filed in 2013.

6   Q     What did your investigation, generally speaking, reveal?

7         THE COURT:  Ms. Kim.

8         MS. KIM:  Yes.

9         THE COURT:  I don't need any of this.

10        MS. KIM:  Do you want me to go straight to the

11  knowledge?

12        THE COURT:  I want to know about Mr. Dhall, and I want

13  to know what he knew.

14  Q     Okay.  What was Mr. Dhall's position at TERiX?

15  A     Mr. Dhall, as of today's date, is an executive vice

16  president in charge of service delivery.

17  Q     Was he a member of the executive team at TERiX?

18  A     Yes.  The way that TERiX carried out its day-to-day

19  functions was there was a four-person executive management team

20  headed by the defendant, and it included Mr. Dhall and two

21  other individuals.

22  Q     Do you know of facts that would lead you to believe that

23  Mr. Dhall had knowledge of the criminal conspiracy in this

24  case?

25  A     I do.

12

1    Q     What facts are those?

2    A     As a member of the executive management team,

3    Mr. Dhall's job function was to be a conduit between Jason

4    Joyce and the executive management team.

5          Mr. Joyce was executing on a day-to-day basis most of

6    the fraud that was orchestrated by Mr. Appleby, so Mr. Dhall

7    would take Mr. Joyce's information, present it to the

8    management team, and then any recommendations or deviations or

9    evolutions of the fraud were then conveyed through Mr. Dhall to

10   Mr. Joyce.

11         In addition, what Mr. Dhall told us was that Mr. Dhall

12   was fully aware of the use of an entity called Summit

13   Technology.

14         It's noteworthy because Mr. Appleby and TERiX's fraud

15   involved several entities.  One of them, Summit Technology,

16   isn't even a real entity.  It's a completely fictitious entity.

17   It had a website that they created and a domain and email

18   addresses, but it was not a legal entity.

19         And Mr. Dhall not only knew of that, he directed the use

20   of that, and he directed the use of other credentials that

21   Mr. Joyce would use in furtherance of the fraud.

22   Q     Was he also familiar with a policy called Snoe Wight?

23   A     Yes.  Without going into too much detail, in 2013, all

24   of the policies and procedures that constituted the core of the

25   fraud were memorialized in a handbook that became referred to

13

1    as Snoe Wight.

2          It began in 2003, and this was in 2013 that that was

3    done.  Mr. Joyce, his charge was to author that document.  He

4    authored that document, by his testimony, with Mr. Dhall and

5    another colleague, Sean Goodman.

6    Q    Was he also familiar with a policy called ClearVision?

7    A    Yes.  As part of the fraud, it was essential to

8    Mr. Appleby that the fraud go undetected, and the fraud was

9    undetected for almost a decade.

10         As part of that, there was a process called ClearVision,

11   and ClearVision was the interaction between TERiX and its

12   customers.

13         If a customer had a concern about the legality of the

14   process, Mr. Quinn, one of the co-defendants, would give a

15   ClearVision presentation, and he would do so under a

16   nondisclosure agreement to hide the fraud.

17         Mr. Dhall was intimately aware of ClearVision and its

18   objectives.

19   Q    Did he know about other certain covert steps undertaken

20   by TERiX to hide its involvement from Oracle?

21   A    Yes.  As part of its widespread processes to -- to hide

22   from the victim, various credentials were created, aliases were

23   used, prepaid phones were used, fake addresses were used.

24   Mr. Dhall was aware of all of that.

25         In addition, at one point the victim became aware of

14

1    TERiX's activity by tracking IP addresses that came back to

2    TERiX that were used to steal intellectual property.

3         As part of that, Mr. Dhall directed Mr. Joyce to use a

4    DSL line, a standard AT&T internet line that anyone could

5    purchase, that was not as easily identifiable as associated

6    with TERiX, and Mr. Joyce told us that Mr. Dhall is the one who

7    directed him to use that facility to engage in the fraud.

8    Q    Did he also know about TERiX's position on one-to-many?

9    A    Yes.

10        MR. SCHNEIDER:  Objection.  Only as to what --

11        THE COURT:  I'm sorry.  What was the question again?

12        MS. KIM:  I asked did Mr. Dhall know about TERiX's

13   position on one-to-many.

14        THE COURT:  All right.  Mr. Schneider, you have an

15   objection?

16        MR. SCHNEIDER:  Well, she's asking what Mr. Dhall

17   knew.  I mean, he might be able -- what he understood --

18        THE COURT:  What's the basis of your objection?  Is it

19   leading or what is your ground?

20        MR. SCHNEIDER:  Speculative.  Speculation.  I mean, I

21   understand the issue is what Mr. Dhall knew, but the way it's

22   framed, it seems to be speculative as to what --

23        THE COURT:  So your objection is based on the

24   assertion that it calls for speculation?

25        MR. SCHNEIDER:  Correct.

15

```
 1              THE COURT:  Repeat the question now.
 2              MS. KIM:  I can rephrase the question, Your Honor.
 3              THE COURT:  All right.
 4     BY MS. KIM:
 5     Q    Do you know if Mr. Dhall was aware of TERiX's policy on
 6     one-to-many?
 7     A    Yes.
 8     Q    How do you know that?
 9     A    Well, one-to-many was the process that was memorialized
10     in Snoe Wight.  The TERiX handbook made it very clear that the
11     process that they were using was to put one computer under
12     coverage and use that to support as many as thousands of
13     computers.
14              Again, Mr. Joyce told us that Mr. Dhall helped author
15     that document.
16              In addition, there's email correspondence with Mr. Dhall
17     where Mr. Dhall is ordering Mr. Joyce to purchase -- they used
18     the code word "Boeings" for part of it, to purchase these
19     one-to-many support contracts.
20     Q    Do you know if Mr. Dhall was also aware of T-Patch?
21     A    Yes.
22     Q    What is T-Patch?
23     A    T-Patch is a -- an automated tool.  So the -- the normal
24     way that the fraud carried out was one of the TERiX employees
25     would have to log into the victim's website and download
```

16

1    intellectual property on a manual basis.

2         T-Patch was designed to automate that process and make

3    the process smoother, in direct violation with Oracle's terms

4    of use, and Mr. Dhall was aware of T-Patch and aware of its use

5    to download intellectual property.

6    Q    You said before that Mr. Dhall served as a conduit

7    between him and the executive team.  Would Mr. Joyce relay any

8    concerns he had to Mr. Dhall?

9    A    In many instances, yes.

10   Q    Do you have any specific examples of any of those

11   instances?

12   A    Yes.  So, in June 2011, Mr. Joyce became of the opinion

13   that at least a core portion of Snoe Wight was illegal, and he

14   was afraid of the consequences of that, and he relayed that

15   belief of the possible illegality of what he was doing to

16   Mr. Dhall directly.

17   Q    How did he relay that?

18   A    By email.

19         MS. KIM:  Your Honor, I have the email if the Court

20   would like to see it.

21         THE COURT:  Yes.

22         MS. KIM:  May I please approach --

23         THE COURT:  We need to have the agent identify it.

24         MS. KIM:  -- the witness and the Court.  Yes.  Can I

25   show it to him first, Your Honor?

17

1       THE COURT:  All right.  All right.

2    BY MS. KIM:

3    Q    I'm showing you what's been marked as Exhibit 710.

4         MS. KIM:  And, Your Honor, for the record, defense

5    counsel has been provided with this exhibit in advance.

6    Q    Do you recognize Exhibit 710?

7    A    I do.

8    Q    What is this?

9    A    This is an email chain between Jason Joyce and Atul

10   Dhall.  The email chain started on June 15th, 2011, and ran

11   through June 27th, 2011.

12   Q    And is the email you were just referring to on page 2 of

13   this exhibit?

14   A    Yes, it is.

15   Q    And can you point out the relevant portions for the

16   Court?

17   A    Sure.  The relevant portion is -- is the highlighted

18   text at the bottom of page 2.  I'll focus on the absolute last

19   portion that's highlighted.

20        It says, "I've been thinking about the Tank process of

21   purposely buying a contract for non-Sun hardware and then

22   turning around and providing patch access for a Sun box.  This

23   cannot in any way be aboveboard, and I will not participate in

24   this process once the FDC is finished.

25        "I am sorry, but if worse came to worst, I do not want

18

1    to be a part of the ramifications. I need to protect my

2    family. I feel I'm protecting them, even if we take a

3    short-term hit, because this decision costs me my job."

4       Q    Do you know what happened after this email was sent from

5    Jason Joyce to Atul Dhall?

6       A    I do.

7       Q    What happened?

8       A    First of all, Mr. Dhall was not in the office when this

9    email was sent, so as a short-term placeholder, Mr. Dhall asked

10   Mr. Joyce to not do anything rash and to wait until he returned

11   to the office.

12          Mr. Dhall then spoke with Mr. Appleby about this

13   situation, and Mr. Appleby convinced Mr. Dhall, who then

14   convinced Mr. Joyce, that what they were doing was -- had been

15   vetted by legal review and was completely in accordance with

16   legal documents and was aboveboard and that Mr. Joyce needed to

17   remain at TERiX.

18          MS. KIM:  Your Honor, at this time I would like to

19   offer Exhibit 710 into evidence.

20          THE COURT:  Any objection?

21          MR. SCHNEIDER:  No objection.

22          THE COURT:  It is admitted.

23          MS. KIM:  That concludes my testimony on the knowledge

24   portion of Mr. Dhall.

25          If the Court would like, I can go into whether the

19

1    conspiracy was otherwise extensive.

2        THE COURT:  I think the main issue for the Court, and

3    the one most likely to resolve this objection, is the issue of

4    knowledge.  Do you have any more questions on knowledge?

5        MS. KIM:  I do not, Your Honor.  Thank you, Agent

6    Fine.

7        THE COURT:  All right.  Mr. Schneider, you may

8    cross-examine.

9        MR. SCHNEIDER:  Yes, I have a few.

10                          - - -

11                   CROSS-EXAMINATION

12    BY MR. SCHNEIDER:

13    Q    Agent Fine, just to make sure that I understand this

14    exhibit here, you indicated that Mr. Dhall had been traveling,

15    correct?

16    A    Correct.

17    Q    Okay.  And that essentially what he said was don't do

18    anything rash until I get back, correct?

19    A    Correct.

20    Q    And then Mr. Joyce follows up with him, as I understand

21    the email chain here, and then says did you have a discussion

22    with B.A. -- which I assume is Mr. Appleby; do you see that?

23    A    Correct.

24    Q    But -- but -- but Mr. Dhall then replies, "I did.  I

25    need to have one more discussion, but I also verified the same

20

1   with outside counsel and can give you details."

2      A    Correct.

3      Q    Do you have any reason to doubt Mr. Dhall did not verify

4   that with outside counsel?

5      A    Well, I think that you are -- are you asking about a

6   specific outside counsel?

7      Q    No.  I'm asking you, since you commented on this email

8   thread, whether or not you have any reason to doubt the

9   veracity of Mr. Dhall in the June 27th reply to Mr. Joyce that

10  says, "I also verified the same with an outside counsel and can

11  give you details"?

12     A    Mr. Dhall, in response to this email, approached a

13  family friend who is an attorney, so I do know that that

14  statement is true, and he asked that attorney in general terms

15  what the -- what the legality of the situation might be.

16     Q    Okay.  All right.  And do we -- you don't have any

17  firsthand knowledge that Mr. Dhall knew that there was criminal

18  activity, do you?  Just that he was aware of what Mr. Joyce had

19  raised concerns about -- in the context of this email?

20     A    Well --

21          THE COURT:  Did he tell you what the lawyer told him?

22          THE WITNESS:  Well, he told -- so the way that that

23  interaction worked was the lawyer basically said that he needed

24  more information.  He needed all of the information to make any

25  sort of informed legal opinion.

1    Mr. Dhall then spent the next six to nine months

2  requesting a full legal review by that attorney from

3  Mr. Appleby, because it wasn't Mr. Dhall's place to do that for

4  the company.

5    Mr. Dhall had reservations about the legality of the

6  conduct based on this email.  After about six to nine months

7  of -- I believe the word they used was "pestering" Mr. Appleby

8  demanding this legal review, Mr. Appleby did agree to the legal

9  review in early 2012; however, that legal review was never

10  conducted and it was -- anything that was delivered was

11  delivered between Mr. Appleby and that attorney directly, and

12  Mr. Dhall had removed himself from that process once

13  Mr. Appleby agreed to it.

14    So no legal opinion was ever provided, I think, largely

15  due to the timing of the filing of the civil lawsuit.

16    THE COURT:  All right.  Thank you.

17  BY MR. SCHNEIDER:

18  Q    But is there anything to suggest that Mr. Dhall had

19  anything more than a suspicion about the legality?  That's what

20  I'm asking you.

21  A    Mr. Dhall knew that the aliases that were being used,

22  and the prepaid phones that were being used, and the facilities

23  that were being used, did not represent real people.  He knew

24  that those -- all of those trappings of the conduct were not

25  based in reality or fact.

22

1      He knew enough about the situation to be concerned about

2  the legality of it and talk to an attorney, and he directed the

3  conduct from approximately 2010 through 2014.  So, yes, I --

4  Q     And as part of your investigation, including

5  interviewing Mr. Dhall, correct?

6  A     Correct.

7  Q     And you chose not to prosecute him, correct?

8  A     I'm an FBI agent.  I don't make prosecution decisions.

9      MR. SCHNEIDER:  Nothing further, Your Honor.

10      THE COURT:  All right.  Anything further, Ms. Kim?

11      MS. KIM:  No, Your Honor.  Thank you.

12      THE COURT:  All right.  Thank you very much, sir.  You

13  may step down.

14      THE WITNESS:  Thank you.

15      THE COURT:  Does the Government have any additional

16  evidence on this issue?

17      MS. KIM:  Not on the knowledge issue, Your Honor.

18      THE COURT:  All right.  Mr. Schneider, do you wish to

19  introduce any evidence -- produce any evidence or call any

20  witnesses on this issue?

21      MR. SCHNEIDER:  No, no affirmative evidence, no

22  witnesses, just the ability to comment at the appropriate time.

23      THE COURT:  All right.  I would be pleased to have

24  final comments on this issue.

25      Mr. Schneider.

23

1          MR. SCHNEIDER:  Thank you.  Just -- just very briefly.

2    I just think that, if anything, the exhibit that was put in

3    front of you, which is the email communications, although it

4    expresses concerns by Mr. Joyce to Mr. Dhall, one, Mr. Dhall --

5    I mean, I don't think -- I think it's a reach, a tremendous

6    reach, to say that he was aware of criminal activity and did

7    anything to furtherance -- in furtherance of the activity such

8    that he would be prosecuted.

9          Because if you read the -- the language in the

10   communications between the two parties, one, he's traveling.

11   Mr. Joyce says, "I understand you don't have any sleep."

12         All Mr. Dhall says is, "Hold on.  Time out."  Then he

13   has a conversation with Mr. Appleby but also verifies -- says

14   he needs to verify and did verify with outside counsel that

15   it's not -- that -- that at least there was a comfort level

16   that was given to him, and I think just to, in a courtroom like

17   this, based on this evidence, to jump from a conversation that

18   a supervisor has had with an employee who expresses concern --

19   even to call it potential whistle-blowing -- based on this

20   though, to say that he's a co-conspirator in the participancy

21   sense for purposes of the Sixth Circuit's analysis of enhanced

22   role, I think, is a stretch.

23         I don't think that Ms. Kim carries the burden on that.

24   Maybe it's a close call, but I don't think that based on the

25   *Anthony* case and the *Lewis* case, which I already talked about,

24

1    if that is strictly applied to this case, I don't think

2    Mr. Dhall is a participant for purposes of an enhancement.

3          I think an enhancement would be improvident under those

4    circumstances.  I think it's a stretch.  That's it.

5          THE COURT:  All right.  Thank you, Mr. Schneider.

6    Ms. Kim.

7          MS. KIM:  I would ask that the Court credit Special

8    Agent Fine's testimony.  I think the evidence proves, at least

9    by a preponderance, that Mr. Dhall was aware of the conspiracy

10   and its criminal objective.

11         Agent Fine testified that he was involved with Summit

12   and that he knew it was not a real company.  He also testified

13   that Atul Dhall knew of the fake credentials and their use for

14   downloading Oracle's intellectual property fraudulently.

15         He also knew about the one-to-many policy, which was in

16   direct violation of Oracle's policy, and of T-Patch, another

17   direct violation of Oracle's policy.  He knew about Snoe Wight.

18   He knew about ClearVision.  He knew about other certain covert

19   steps that TERiX undertook to hide detection from Sun and

20   Oracle.

21         For those reasons, we believe that the enhancement

22   clearly applies.  Thank you.

23         THE COURT:  All right.  Well, the Court is going to

24   deny this objection.

25         The Court is convinced by a preponderance of the

25

1    evidence, if not more, that Mr. Dhall was a knowing participant

2    in this conspiracy.

3        It really isn't rocket science.  It's pretty simple.

4    This conspiracy involved the theft of valuable intellectual

5    property.  That property belonged to someone other than TERiX.

6        Anyone involved with the underlying business and the

7    underlying technology would be quite aware that this was

8    intellectual property, and certainly these individuals,

9    including Mr. Dhall, was aware that it didn't belong to TERiX

10   and that they were taking it from Oracle, and that they were

11   taking it from Oracle by the use of a very sophisticated scheme

12   of deception and concealment, and Mr. Dhall was aware of all of

13   those underlying facts.

14       The only question that's been raised about it is whether

15   that -- whether he might have been convinced to have some --

16   some belief that this could somehow be justified, but he was

17   aware of the basic facts, and those basic facts add up to a

18   knowledge that a fraud was being perpetrated.

19       So the Court finds that the probation officer's

20   calculations are correct and that there should be a four-level

21   enhancement in this case.

22       He not only was aware of the fraud, but he participated

23   in carrying out the fraudulent scheme.  Indeed, I believe there

24   was a concession that the only issue here is whether he knew

25   that what he was doing involved the facilitation of a fraud,

26

1    and the Court is convinced by a preponderance of the evidence

2    that he was.

3          So were there any other objections that would affect the

4    guideline sentencing range in this case, Mr. Schneider?

5          MR. SCHNEIDER:  There are not.

6          THE COURT:  All right.  Ms. Kim, the Government

7    doesn't have any?

8          MS. KIM:  No, Your Honor.

9          THE COURT:  Now, returning then to the issue of

10   whether the Court should accept the Rule 11(c)(1)(C) plea

11   agreement in this case, the Court has determined that the

12   probation officer's calculations regarding the guideline

13   sentencing range are correct, that the guideline range is 51 to

14   63 months of incarceration, and a term of supervised release of

15   one to three years, and a fine ranging from $10,000 to

16   $100,000.

17         This plea agreement calls for a sentence no greater than

18   60 months and a fine as determined by the Court.  Here, the

19   probation officer has recommended a sentence of 60 months and a

20   two-year term of supervised release and a fine of $25,000.

21         Now, the nature and circumstances of the offense

22   involved a conspiracy to acquire software patches by the

23   creation of false entities and misrepresentations.

24         The defendant, Mr. Appleby, directed others, including

25   Olding, Quinn, and Joyce, to perform acts in furtherance of the

27

1  conspiracy, and Dhall was also involved knowingly in performing

2  acts in furtherance of the conspiracy.

3       Here, the defendant has no prior criminal record.  He's

4  been married for over 39 years.  He's been steadily employed.

5  He's currently the CEO of TERiX.

6       The Court concludes that the agreed sentence in this

7  case is sufficient to reflect the seriousness of the offense

8  and promote respect for the law and to provide just punishment

9  and to afford adequate deterrence and to protect the public

10  from any more crimes by the defendant.

11       The Court notes that the agreed-upon restitution in this

12  case has been paid.

13       So the Court finds that this Rule 11(c)(1)(C) plea

14  agreement is reasonable and the Court is going to exercise its

15  discretion and adopt the plea agreement, and that leaves for

16  further determination today just what sentence is appropriate

17  in this case.

18       In arriving at a sentence, the Court is called upon to

19  consider a wide variety of factors, and those factors include

20  the nature and circumstances of the offense, the history and

21  characteristics of the defendant, the need for the sentence to

22  reflect the seriousness of the offense and promote respect for

23  the law and provide just punishment, as well as the need for

24  the sentence to afford adequate deterrence, and to protect the

25  public from any more crimes by the defendant as well as the

28

1    need for the sentence to provide the defendant with any

2    educational or vocational training, medical care, correctional

3    treatment in the most effective manner.

4         The Court should always consider the kinds of sentences

5    available, and the Court should strive to avoid unwarranted

6    sentencing disparities among defendants.

7         So with all of those issues in mind, and any others that

8    may be relevant to the final issue, which is what sentence is

9    sufficiently severe, but no more severe than necessary, to

10   accomplish all of the goals of sentencing, the Court would like

11   to have statements from counsel.

12        Before doing so, I would like to ask Mr. Appleby if he

13   wishes to make a statement on his own behalf.  Do you, sir?

14        I would like for counsel and defendant to return to the

15   lectern; and, Mr. Appleby, if you have a statement, I would be

16   pleased to have it, sir.

17        THE DEFENDANT:  Yes.  Thank you, Your Honor.  I have

18   disrespected the law.  I have caused great harm and also

19   hardship.  I apologize to the Court for my actions.  I

20   apologize to Oracle.  I apologize to my wife Christine, my

21   sister Maggie, my friends, my family, also my employees, many

22   of which have been -- have been drastically impacted, okay, by

23   my actions.  I've had to lay them off, and there have been bad

24   consequences for those families.

25        When I created the WEX log-ins, I didn't know it at the

29

1    time but I do know now that what I had done was wrong.  When

2    the Sevanna log-ins were determined later on -- I should say

3    that I confirmed later on that the downloads from Sevanna were

4    being used to send patches out to clients that did not have the

5    rights to them, I did not stop that process.  Your Honor, I

6    should have.

7         My takeaway from this is that my disrespect for the law

8    has broad and devastating consequences not just for me but for

9    the hundreds of people that have been affected by this.

10        Your Honor, I've learned my lesson.  You will not see me

11   again, Your Honor.  I beg the Court's forgiveness and also

12   leniency.

13        Thank you.

14         THE COURT:  Thank you for your statement, sir.

15         MR. SCHNEIDER:  Your Honor, I know that it's generally

16   not your protocol, but would the Court indulge hearing very

17   briefly from Mr. Appleby's wife?

18         THE COURT:  I have read a very compelling letter from

19   Mrs. Appleby, and I appreciate receiving it.  Indeed, I have

20   received many letters of support on behalf of Mr. Appleby.

21   I've read every one of them, and I want those who wrote letters

22   to know that the Court has read them and the Court appreciates

23   receiving them.

24        They do give me significant insight into Mr. Appleby's

25   character and his many contributions to the community and to

30

1   his employees and to his friends.  So those are all very much

2   appreciated.

3           MR. SCHNEIDER:  Okay.

4           THE COURT:  I would like to have statements from

5   counsel now.

6           MR. SCHNEIDER:  Thank you.  Do you want Mr. Appleby --

7           THE COURT:  He can stay right there.

8           MR. SCHNEIDER:  I appreciate this opportunity, and I

9   want to say for purposes of the record Mr. Appleby comes before

10  you as the fourth person that has had to face this Court, and

11  with respect to the other three, the -- I'm not sure that the

12  narrative on what really transpired that caused the crimes to

13  be committed was ever fully vetted based on just simply the way

14  those proceedings took place, and I wanted to -- and I tried to

15  in the sentencing brief, and I won't necessarily cover all the

16  same ground, but I think it is, for purposes of the nature and

17  circumstances of the offense, particularly in light of

18  Mr. Appleby standing in front of you, particularly important

19  that the Court try to understand the dispute that occurred in

20  the civil context, the basis, and the allegations of that

21  dispute, and how it played out just to get a better

22  understanding of the nature and circumstances of these offenses

23  under 3553(a)(1).

24          So here's what happened.  In early as -- well, let me

25  back up:  So there's a Solaris operating system that was

31

1    created by Sun whenever -- I don't know exactly when that was

2    but in the early 2000s.  The Sun Solaris operating system was a

3    system that TERiX would provide service for.

4            TERiX is in the business of being a third-party

5    maintenance firm, and in those cases Sun had -- when it would

6    sell hardware and software, it would license that, and so the

7    license language is pretty clear, that there was a license to

8    use and that Sun granted each licensee, so anyone who purchased

9    the Sun equipment, for whom might have been a TERiX customer,

10   Sun grants you a nonexclusive and nontransferable license for

11   the internal use only of accompanying software and

12   documentation and any error corrections provided by Sun, by the

13   number of users in the class of computer hardware for which the

14   corresponding fee has been paid.

15           That is what rooted this understanding on the part of

16   TERiX that it could provide service for customers that were

17   Solaris subscribers, because their customer had license rights

18   that entitled them to bug fixes and software maintenance.

19           Then enter -- and that license that I just read you just

20   for purposes of the record -- I guess it doesn't really matter,

21   but there were Solaris 7, 8, and 9 operating systems.  Then

22   came along the Sun 10 operating system, and that had a little

23   different license to it, and there had been some dispute at

24   that point in time starting to come about between Sun -- this

25   is before Oracle, Your Honor.  Oracle didn't acquire Sun until

32

1    2010, but there started to be some back and forth, some

2    interaction between Sun and TERiX, and TERiX then sought

3    counsel, and I attached this to the brief, but Steve Foletta,

4    he's a credentialed intellectual property lawyer in the Silicon

5    Valley area, was engaged, and on this idea that the license

6    rights that TERiX customers might have, and Mr. Foletta opined

7    in 2006 to TERiX -- TERiX is the client -- a private patch

8    should be considered an update for the Solaris 10 operating

9    system software that is covered by the Solaris 10 SLA and B

10   accordingly.  The license in the Solaris 10 should permit that

11   customer to install the update on all customers' boxes.

12           Mr. Foletta, within just a couple weeks, in a more

13   detailed analysis, opined that he believes that TERiX had a

14   very strong and safe position in using the procedures and

15   methodologies to obtain public and private patches for the

16   Solaris software for such customers without violating or

17   infringing on any of Sun's copyrights.  I paraphrased that, but

18   that letter is attached to the brief.

19           So this -- this -- and I try to say this in the brief,

20   and maybe I can say it better now.  Maybe I said it better in

21   the brief than what I'll say now, but this methodology started,

22   sanctioned by counsel, that if you are a Sun subscriber of a

23   Solaris system and you have a license and the license language

24   is X, you have the right to those software patches.

25           When it became a -- and TERiX would have the right to be

33

1    able to go in and provide that maintenance for you because it's

2    your -- they are your patches under the license.

3          Well, when there became an issue then with -- with that,

4    and Sun didn't like that, then vetted with counsel, still Steve

5    Foletta, later Tom Armstrong, another credentialed lawyer, the

6    idea was, well, if you are the licensee, you have every right

7    to be able to assign the license.

8          So the methodology changed from simply being able to go

9    into the -- and download patches to service Hewlett-Packard or

10   Verizon or Credit Suisse, to getting the client, the customer,

11   Hewlett-Packard, to assign the license rights.

12         Again, that was rooted in counsel's opinion and vetted

13   with counsel.

14         Oracle acquired Sun in 2010; and Oracle, looking at the

15   entity that it acquired, obviously made a determination that

16   third-party maintenance servers are not something that perhaps

17   they want to compete with.  And they decided, in Mr. Appleby's

18   view, in TERiX's view and in TERiX's counsel's view, that the

19   license language is bilateral.  You can't unilaterally change

20   it, but Oracle simply decided to change that -- in a unilateral

21   basis -- that third-party maintenance of Solaris software was

22   off limits, and, well, that didn't deter.  That's the problem

23   here.

24         We're talking later in the game than perhaps what the

25   Government would suggest.  That's what -- there's when TERiX --

34

1   and Mr. Appleby admits this -- the methodology sort of morphed

2   again, because now Sun -- who really is sort of a Goliath of a

3   victim in a lot of ways -- was saying no, and they continued to

4   find ways to be able to service their customers.

5       I want to say that also for purposes of -- so that's the

6   dispute, and it was a hard-fought dispute.  The case was filed

7   in 2013.  It initially settled in 2015.  That happened about a

8   month after a search warrant was executed on the Dublin, Ohio,

9   TERiX offices.  The case settled.

10      The fulfillment of that settlement didn't come about the

11  way it was supposed to, so there was some renewed litigation.

12  They finally settled, as this Court knows, last February.

13      But the point is it was vigorously fought.  It was hotly

14  contested up until the point when TERiX had to sort of fish or

15  cut bait and decided for a lot of reasons that -- why people

16  settle cases, to settle the case, and I know Mr. Hollenbaugh in

17  this court told you sort of the same thing when Mr. Olding

18  stood in front of you, that there was a business decision that

19  was made.

20      But in furtherance I've attached a letter from a

21  TERiX -- the -- the way the -- because WEX, Sevanna, and Summit

22  were also named as defendants in addition to TERiX.  TERiX had

23  counsel different than WEX, Sevanna, and Summit.  They are all

24  part of this case, but John Picone has tendered a letter that

25  I've attached, I think, as Exhibit D to my brief that -- that I

35

1    think is important for you to understanding the gravity of the

2    offense here, and what Mr. Picone had indicated is that there

3    were serious issues relating to the viability of Oracle's

4    copyright claims, that there were antitrust claims that could

5    have been brought, and thought about being brought, that could

6    have radically reshaped the case.

7         And the -- and there's a point on that -- I don't want

8    to belabor it, you know, because then I run a fine line here as

9    well, but -- but Mr. Appleby was with a trade association at

10   the same time and was getting the trade association interested,

11   piquing their interest in maybe Oracle is committing some sort

12   of anticompetitive thing here, and as soon as Oracle got wind

13   of that, then things even got rougher in the -- in the civil

14   suit, but in any event, Mr. Picone, he opines had the antitrust

15   claims been brought, it could have radically reshaped that.

16   Maybe we wouldn't be here.  Maybe we would.  I don't know.

17        He also indicated that -- that the damages that Oracle

18   had alleged were probably grossly inflated, but we're -- we're

19   beyond that, but I think the point here is that as bad -- I

20   mean, there's wire fraud in this case.

21        There's no doubt.  There's wire fraud.  There were false

22   credentials that were used, but the way it's been -- the

23   narrative that's been given to this Court up to this point in

24   time, because of the way the case has played out, and -- and --

25   and there was not necessarily a need, this really didn't start

1    in a backroom in 2003 or 2004 or, as this information says, in

2    2005 with an intention to get behind Sun and infringe on its

3    copyright or to do the same with Oracle.

4         It was -- it started with the most earnest understanding

5    of a customer's license rights.  It morphed to the customer's

6    right to assign those rights, so that there was agency in

7    place, to then the more downstairs, perhaps nefarious, ways to

8    get behind.

9         One other thing -- a couple other things that I want to

10   say that I think might have an impact on the Court is that --

11   that when a -- Solaris 8 -- Solaris 8 came out with a new -- a

12   new program, it had a different license, and TERiX read that

13   license and realized that probably couldn't be assigned.  They

14   weren't going to do business, so they -- they didn't go in and

15   try to provide maintenance on customers that had subscribed to

16   the Solaris 8 Vintage.

17        They still thought they could do it with 7, 8, 9.  They

18   thought they could do it through agency with 10, but they

19   didn't bother that; and had they wanted to poach that business

20   and be able to service that, they could have, but they didn't

21   find ways to -- to sneak around and to do that.

22        TERiX also, at its own expense, developed a number of

23   patches for Solaris -- daylight savings patch at its own

24   expense, free.

25        So this is -- I just don't want this Court to have a

1    feeling here that TERiX is a bunch of executives in a backroom

2    that were going to go out and do things the cheap way.

3            This is -- this is a highly competitive business.

4    Third-party maintenance firms.  Try to survive.  They provide a

5    valid function.

6            Their client list is amazing.  And Hewlett-Packard, even

7    during this dispute, Hewlett-Packard became one of their best

8    customers by having its own in-house counsel and others

9    investigate what TERiX was doing.

10           They kind of came to the conclusion, "I think TERiX is

11   probably okay," which goes back to what Picone said.  You know,

12   this case never was litigated to conclusion.  The infringement

13   claims may be marginal, may be not.  That's water over the dam.

14           The other thing I want to say is that there's a level of

15   transparency here that doesn't get captured necessarily in

16   Agent Fine's testimony, but he mentioned the ClearVision.

17           Can you imagine that you have got counsel that has

18   helped develop some of these protocols or at least opined that

19   you can do it, and then you present to large corporations' I.T.

20   departments, in many cases with their in-house counsel on the

21   phone, a 90-minute presentation, "Here's what we're doing."

22           There's a level of transparency there that, I think,

23   sets this case apart perhaps in ways that other -- I mean, most

24   of the fraud cases you see don't have sort of that level of

25   transparency, I suspect.

38

1   So those are points that I thought were worthy to make,

2   because I think having a flavor for the litigation and how the

3   company started off before it morphed into some of the darker

4   things that it did that brought it before this Court is

5   important, because I don't think the Court has heard that

6   before.

7   There are -- in a statement of facts, they are

8   talking -- you know, there's a listing of 2,713 downloads, if

9   we had gotten into this in much detail.  Eighty percent of

10  those downloads were not used for customers.  They were used

11  for internal purposes.

12  Mr. Appleby -- we sort of fought over this, this idea of

13  being able to have an alias and get a service contract for your

14  own use.  He's not sure that that was criminal.  I had to

15  suggest to him that it probably is, but he -- I say that to

16  this Court because they weren't thinking in those terms at the

17  time.

18  They thought that if Oracle wasn't going to allow them a

19  service contract, they would find a way to get a service

20  contract.  That's part of the conspiracy.  That's why they're

21  here.

22  We're not minimizing that, but I say that for whatever

23  benefit that that is, and then -- and then finally I want to

24  say that -- I don't know that I need to go through all the

25  history, character, and background.  We're just on the nature

39

1    and circumstances of the offense.

2         But if I -- if I'm speaking in total mitigation, I would

3    like to say that from the time that certainly this criminal

4    proceeding commenced, and you heard Mr. Appleby tell the Court

5    that there have been some, you know, some economic strident

6    issues with respect to TERiX.

7         Mr. Appleby, not his co-defendants, has been the one

8    that has personally subsidized the company, to keep people

9    employed; and also if you were to look at the 11(c)(1)(C)

10   stipulated loss amount of $1.2 million, which arose out of a

11   confidential mediation in this case, that was satisfied and

12   funded, and that was funded from Mr. Appleby and his resources

13   and not those of his colleagues, to the extent that the Court

14   wants to look at that as some form of mitigation.

15        I want to say that, you know, I mean, he is 66 years

16   old.  Just this past weekend, I'm dealing with him getting

17   ready for this sentencing while at the same time he's trying to

18   enjoy his 40th wedding anniversary with Christine.

19        They tried to get away for the weekend, and they got

20   away for the weekend, but he was on the phone with me, and we

21   were emailing back and forth, and so -- so this individual

22   comes in front of you, Your Honor, 66 years old, totally

23   law-abiding, as hard a worker as you are going to find, perhaps

24   thinks a little differently.  Maybe that's his background.

25   Maybe that's the I.T., the intellectual property background,

40

1    maybe the engineering side of him.

2          It's not all -- you know, he sees things a little

3    differently.  I think that when he stands in front of you and

4    he tells you that he gets it, and that he accepts

5    responsibility and he knows that what he did was wrong, he

6    means it.  He's not doing that just, you know, to try to work

7    something over on the system here.  When he tells you that he's

8    learned his lesson, I truly believe that.

9          So you've all the -- you've got the character letters.

10   I mean, it certainly appears -- those are not filtered letters.

11   I didn't talk to any one of those individuals before they wrote

12   that letter.  I don't think Mr. Appleby did that either.

13         I think there's -- the general theme is that he and his

14   wife, I mean, they are sort of a union in that regard, are just

15   very open with very many -- with a lot of people.  They are

16   very gracious.  They have stepped to the plate to help other

17   people, and I think that that speaks well for him in

18   mitigation.

19         I understand that this Court has made its ruling on his

20   role, and that that sets him apart from those of his

21   colleagues, but I would say, given what he's done to keep the

22   company going, given what he's done to sort of repay the

23   obligations to Oracle in this case personally, and -- and this

24   Court, hopefully, having a little better flavor for the nature

25   and circumstances of the litigation and that there were still

1    claims and still people that think TERiX might have been more

2    right than wrong, or Oracle might have been less right than

3    wrong, I think that a sentence that would be sufficient, not

4    greater than necessary in this case, would be something really

5    along the lines of that of Mr. Olding, but -- but -- but the

6    five-year recommendation from Ms. Boucher and Ms. Kim in her

7    sentencing brief, I think that that would represent a

8    five-time -- a -- a times five level over that of his co-owner

9    and colleague, and I think that that would be greater than

10   necessary to accomplish the sentencing objectives here.

11        I don't think the deterrence issue -- I mean, I've

12   spoken to the deterrence issue in the brief.  He doesn't need

13   rehabilitation.

14        You know, he's just -- I think he's an individual that,

15   based on his history, character, and background, and if you --

16   if you -- if you put that in the blender with the nature and

17   circumstances of the offense, I think that a sentence -- a

18   substantial departure from the five-year recommendation is

19   warranted in this case.

20        I don't want to get ahead of myself here, but I did have

21   a conversation with Ms. Kim -- we can address that maybe

22   later -- as to whether or not the Court might indulge itself to

23   staggering his sentence such that any sentence that is imposed

24   on Mr. Appleby in the -- in the incarceration sense were to

25   begin when Mr. Olding completes his one-year, one-day sentence

42

1   for the benefit of the 100 employees that presently are still

2   employed at TERiX, and there's some other entities, some

3   international, that are part of the TERiX family, and it really

4   seems that both -- that Mr. Olding and Mr. Appleby are the two

5   irreplaceable ones; and if they are gone at the same time, I

6   think that that reaps a consequence on others that this Court

7   could avoid, and maybe I'm ahead of myself on that.

8           That's all I have in mitigation at this point, Your

9   Honor.

10          THE COURT:  Very well.  Thank you, Mr. Schneider.

11  Ms. Kim.

12          MS. KIM:  Thank you, Your Honor.  With respect to the

13  nature and circumstances of the offense, I would like to

14  clarify a couple points that Mr. Schneider made.

15          Putting aside and assuming everything he represented

16  about the license disagreement between Oracle and TERiX were

17  true, we know for a fact that in 2005 Mr. Appleby created the

18  Richard Aarons alias, and in 2008 Oracle was very clear, or Sun

19  back at that time, was very clear that they wanted TERiX to

20  stop doing that, to stop probing, to stop doing the time and

21  materials calls.

22          Things that were not vetted by counsel, and this is --

23  these are facts -- were the code names that were being used,

24  the Boeing Process, the Tank Process, Plan E, Run Silent, Run

25  Deep.  That was never vetted by counsel.

43

1    Using fake aliases and credentials to log in undetected
2    to download patches, intellectual property from Sun and Oracle
3    undetected, never vetted by counsel.  Using prepaid credit
4    cards, never vetted by counsel.  Using fake email addresses,
5    unauthorized, never vetted by counsel.  Using fake addresses.
6    For example, for Sevanna, they used the Santa Clara Convention
7    Center's address as the registering address.  He also used his
8    sister as a registering agent on the formation documents.  That
9    was never vetted by counsel.
10    So it's inaccurate to say that all aspects of this
11    conspiracy were vetted by counsel.  They were not.
12    I also want to point out that TERiX is not being
13    sentenced here today.  Mr. Appleby is.  And the Court has
14    already found that Mr. Appleby was, in fact, the leader and
15    organizer of this conspiracy.
16    He devised this conspiracy.  He orchestrated the
17    conspiracy.  He directed every aspect of it, and he approved
18    every aspect of it.
19    Every single co-conspirator points to the defendant as
20    the mastermind of this fraud that spanned nearly a decade.
21    He is by far the most culpable defendant in this
22    conspiracy, and that warrants the imposition of a severe
23    punishment.
24    There are, however, some mitigating factors.  His
25    history and characteristics, he has no criminal history, and I

44

1    think it's clear that he has accepted responsibility as

2    revealed by his remarks today; and with that in mind, that's

3    why we crafted the 60-month cap in the (c)(1)(C) plea agreement

4    that the Court has accepted.

5         However, the sentence must reflect the seriousness of

6    the offense, and here the defendant committed a very serious

7    offense that spanned nearly ten years.

8         This sentence must reflect that seriousness; and a

9    60-month sentence, which is toward the higher end of

10   guidelines, will do just that.

11        There's also the need for adequate deterrence --

12   deterrence, and that's both general and specific.

13        With respect to specific deterrence, the defendant needs

14   to understand what he did was wrong, unlawful, and it won't be

15   tolerated in the future; and as for general deterrence, other

16   business owners need to know that they will be punished for

17   these types of activities so that they are not tempted to

18   follow the defendant's path.

19        For those reasons, Your Honor, we would respectfully

20   request that the Court impose a sentence of 60 months'

21   imprisonment, two years of supervised release, and at least a

22   $25,000 fine.

23        All of that would be sufficient, but not greater than

24   necessary, to achieve the goals of sentencing in this case.

25   Thank you.

45

1          THE COURT:  Thank you, Ms. Kim.

2          I've outlined in a general way the factors the Court is

3     called upon to consider in arriving at a sentence.  I would

4     like to focus now on the ones that I think are most compelling

5     in this case.  I must begin with the seriousness of the

6     offense.

7          This case does involve an extensive and sophisticated

8     conspiracy, which had high stakes, which caused significant

9     damage, and was in a -- a large and sophisticated fraud, and

10    the Court's sentence should reflect the seriousness of the

11    offense.

12         The history and characteristics of the defendant are a

13    very important factor in this case.  Mr. Appleby stands before

14    the Court with no criminal record whatsoever.  He's been a --

15    an upstanding member of the community throughout his life, and

16    his involvement in this fraudulent activity takes on a --

17    something in the nature of aberrant behavior on his part.

18         The Court is not concerned that he would be likely to

19    repeat this kind of activity in the future, and just the

20    prosecution and the consequences of the discovery of the fraud

21    in themselves are likely to be a powerful deterrent in this

22    case.

23         The Court has received many, many letters of support,

24    which reflect the fact that Mr. Appleby is -- other than his

25    involvement here -- a very responsible and creative and

46

1   productive member of society.

2        This case may well have started out with some feelings

3   that -- that TERiX was standing in the role somehow as a

4   protector of the rights of its customers with respect to the

5   licensing agreements and the rights that they received as

6   purchasers of technology from Sun and Oracle, and with some --

7   maybe with some feeling that they were going to stand up for

8   the, quote, little guy, and perhaps with some initial

9   credibility to feeling that the earlier licensing agreements

10  permitted them to service their customers by providing patches.

11       But long before -- well, long before this prosecution

12  began, the circumstances had significantly changed, and it was

13  quite clear to Mr. Appleby and his co-defendants that they were

14  participating in fraudulent activity which misappropriated the

15  intellectual property of someone else, and the sophisticated

16  way in which they concealed what they were doing and

17  misrepresented the true nature of what they were doing by

18  creating fictional entities and concealing of the facts from

19  Sun and Oracle, those activities in and of themselves, the

20  concealment about what they were doing, speaks volumes about

21  their knowledge that it was wrong, and they continued down that

22  path for a significant period of time.

23       I've made a ruling on the four-point enhancement in this

24  case for a conspiracy that involved at least five people and

25  was otherwise significant, and the sentence that I'm going to

47

1   ultimately impose in this case would be the same whether I

2   reached that conclusion or not.

3       If I had granted that objection, I still would have

4   supported and concluded that a two-level enhancement should be

5   imposed in this case, and that would have given us a total

6   offense level of 22, with a guideline sentencing range of 41 to

7   51 months.

8       It's my conclusion that the sentence that would serve

9   all of the purposes of sentencing and would be sufficiently

10  severe to reflect the seriousness of this offense is a sentence

11  significantly at variance from the guideline sentencing range,

12  even from the lower range that I just mentioned, the 41 to 51

13  months.

14      The Court believes that Mr. Appleby has sincerely

15  accepted responsibility for what he has done, that he presents

16  little risk of recidivism, and the Court believes that a

17  sentence of 24 months' incarceration would serve all of the

18  important goals of sentencing in this case:  that it would

19  reflect the seriousness of the offense; that it would afford

20  adequate deterrence; that it would protect the public; and that

21  it would be a sentence that is sufficiently severe, but not

22  more severe than necessary, to accomplish the goals of

23  sentencing.

24      The Court is going to impose a sentence of 24 months'

25  incarceration in this case.  That will be followed by two years

48

1    of supervised release.

2         The Court is also imposing a fine in this case, and the

3    Court believes that it will add to the reflection of the

4    seriousness of the offense, and the Court is going to impose a

5    fine of $100,000 in this case.  I'm also required to impose a

6    statutory special assessment of $100 and will do so as part of

7    my sentence.

8         Restitution would be an important part of the Court's

9    sentence, but it is my understanding that the restitution has

10   been paid in this case.  Am I correct, counsel?

11        MS. KIM:  That's correct, Your Honor.

12        MR. SCHNEIDER:  It is, Your Honor.

13        THE COURT:  All right.  I'm going to waive any

14   requirement of interest on the fine that I've imposed in this

15   case.

16        Now, as is often the case in any criminal activity,

17   there are other victims other than the primary victim, and

18   these collateral victims in this case often include family

19   members.  In this case, they include many innocent employees of

20   this company who have devoted years of their lives to their

21   employment with this company.

22        It may be that the company has some future and that the

23   Court can, by structuring its sentence here, at least provide

24   some opportunity that that might be the case.

25        There are two principals in this business.  Mr. Appleby

1    was certainly the -- the primary organizer and manager of this

2    business operation.  He was -- he had a person who was somewhat

3    like the junior partner, and that, of course, was Mr. Olding.

4    Mr. Olding has perhaps the capability of continuing to run the

5    company.

6          I'm going to permit Mr. Appleby to begin serving his

7    sentence in this case on the date that Mr. Olding is released

8    from confinement on his sentence of one month and -- for 12

9    months and -- one year, with the hope that there may be some

10   relief for the innocent victims of this offense, the collateral

11   ones that I mentioned.

12         Now, counsel, do either of you see any legal impediments

13   to the sentence the Court has just announced or do either of

14   you have any objections that the Court has not already ruled

15   upon?  Mr. Schneider, do you?

16         MR. SCHNEIDER:  No, Your Honor.

17         THE COURT:  Ms. Kim, do you?

18         MS. KIM:  No, Your Honor.

19         THE COURT:  Now, counsel and perhaps our probation

20   officer can assist me in adding any additional stipulations

21   that will assist in carrying out the Court's intention that

22   Mr. Appleby begin serving his sentence within a reasonable

23   period of time after Mr. Olding has completed serving his

24   sentence.

25         Counsel, can you help me on this?

50

1      PROBATION OFFICER:  Your Honor, I may suggest, if you

2  hold back the J&C, I can notify the Court when Mr. Olding is

3  released into a halfway house.  I've seen that done in the

4  past.  If the J&C is held back, then that would delay the --

5  the voluntary surrender date.

6      THE COURT:  All right.  Let me see what --

7  Mr. Schneider, do you have any thoughts?

8      MR. SCHNEIDER:  I thought Mr. Olding's sentence was

9  one year and one day, and I didn't know --

10     THE COURT:  Has he begun serving that sentence?  Does

11  anyone know?

12     MR. SCHNEIDER:  Yes, he has.

13     MS. KIM:  Yes.

14     THE COURT:  He has.  All right.  Ms. Kim, do you have

15  any suggestions?

16     MS. KIM:  We can look into when exactly he may be

17  released; but with good behavior, it would probably be less

18  than 12 months.  My calculations would put him going in about

19  mid February, since he was sentenced at the end of January,

20  with a 30-day voluntary surrender notice.  If the Court would

21  like, we can look into it.

22     MR. SCHNEIDER:  He just --

23     THE COURT:  We'll take a brief recess.  I would like

24  to talk with our probation officer.

25     COURTROOM DEPUTY:  Please rise.  This court will stand

51

1    in recess.

2         (Recess taken from 10:54 a.m. to 10:58 a.m.)

3         THE COURT:  All right.  Counsel, here's what we're

4    going to do:  The Court is going to stay execution of the

5    incarceration part of its sentence in this case until further

6    notice.

7         The probation office is going to track Mr. Olding's case

8    and advise the Court when it would be appropriate to put on an

9    additional order calling for the execution of the sentence of

10   incarceration.

11        Counsel, we'll be notifying you.  There are various

12   things that might occur.  Mr. Olding's release date, it looks

13   like it would be somewhere in February.

14        He could be released to a halfway house earlier than

15   that, and that might -- the conditions of that release to a

16   halfway house might permit him to return to his employment, and

17   then the Court would put on an order that would require

18   Mr. Appleby to begin serving his sentence of incarceration.

19        So the Court is going to impose the sentence that has

20   just been announced.  It's going to stay the execution of the

21   sentence of incarceration until further order of the Court.

22        Now, Mr. Appleby, please stand, sir.  Was there a waiver

23   of appellate rights in the plea agreement?

24        MS. KIM:  Yes, Your Honor.

25        THE COURT:  And -- but there is --

52

1          MS. KIM:  Except for the two bases, ineffective

2    assistance of counsel and prosecutorial misconduct.

3          THE COURT:  All right.  Mr. Appleby, you have certain

4    limited appellate rights.  If you desire to exercise those

5    rights, you would have the right to have the clerk of this

6    court file a Notice of Appeal on your behalf.  You would have

7    the right to have counsel appointed if you couldn't afford

8    counsel and to have the Government pay the costs of any such

9    appeal and, as I said, to have the clerk file a Notice of

10   Appeal on your behalf.

11         Please consult with your counsel and tell me whether you

12   want the clerk to file a Notice of Appeal.

13         THE DEFENDANT:  No.

14         THE COURT:  If you do desire or intend to appeal, you

15   must file a written notice within 14 days.  Do you understand

16   that?

17         THE DEFENDANT:  Yes, 14 days.

18         THE COURT:  All right.  Counsel, is there anything

19   further on this case today on behalf of the Government?

20         MS. KIM:  No, Your Honor, thank you.

21         THE COURT:  Or on behalf of the defendant?

22         MR. SCHNEIDER:  There is, Your Honor.  During the

23   pendency of this case, and really through the initial

24   benevolence of Ms. Kim, Mr. Appleby was able to retain his

25   passport because he does have some travel and some of the TERiX

53

1    businesses are international.

2         Just during your recess, I had the conversation with

3    Ms. Kim again about that, but I would be making the request

4    that he would be able to retain his passport until he has to

5    surrender.  I hope I'm not pushing the envelope here too much.

6              THE COURT:  Ms. Kim?

7              MS. KIM:  I leave this at the Court's discretion, Your

8    Honor.  The original reason we allowed him to have it is to

9    continue and maintain the business.

10        If the reason we are holding off on the execution of the

11   imprisonment is to maintain the business, then I am fine with

12   that going forward, but we are in a different position since he

13   has now been sentenced.

14        I will note for the record we've had no problems with

15   him on pretrial supervision.

16             THE COURT:  I don't think he's a risk of flight; and

17   if his continued management of the business requires travel,

18   then we're going to let him keep his passport until he reports.

19             MR. SCHNEIDER:  Thank you, Your Honor.  Other than

20   that, nothing further from the defense.

21             THE COURT:  All right.  Very well.  That will conclude

22   this matter, and the clerk may adjourn court.

23             COURTROOM DEPUTY:  Please rise.  This court is

24   adjourned.

25        (The proceedings were adjourned at 11:02 a.m.)

54

1                          - - -

2                     WITNESS INDEX

3                          - - -

4    WITNESSES          DIRECT CROSS REDIRECT RECROSS

5    PLAINTIFF's:

6    DAVID FINE            9     19

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

1
                    C E R T I F I C A T E

2


3          I, Allison A. Kimmel, do hereby certify that the

4     foregoing is a true and correct transcript of the proceedings

5     before the Honorable James L. Graham, Senior Judge, in the

6     United States District Court, Southern District of Ohio,

7     Eastern Division, on the date indicated, reported by me in

8     shorthand and transcribed by me or under my supervision.

9

10

11                              s/Allison A. Kimmel
                               Allison A. Kimmel, RDR, CRR, CRC
12                             Official Federal Court Reporter
                               April 9, 2018
13

14

15

16

17

18

19

20

21

22

23

24

25